## THE STEAM FERRY-BOAT HACKENSACK.

## THE SCHOONER HENRY D. BREWSTER.

*(District Court, S. D. New York.* November, 1880.)

1. COLLISION—FERRY-BOAT ENTERING SLIP—LOOKOUT—RIGHT OF SAIL-
ING VESSELS—COSTS.

Where the steam ferry-boat H., while entering her slip at the foot
of Barclay street, collided, in the day-time, with the schooner B., her
bowsprit entering one of the windows on the starboard side of the H.
aft of the paddle-box, and the B. was at the time getting under way,
having hoisted her jib and then her foresail, the wind being southerly,
and her bow line having been cast off and stern line fast to the rack,
though slack, and the B. claimed that at the time the jib-boom entered
the window she was lying with her whole starboard side close up to
the southerly side of the south rack of the slip, and that the H.
stopped after the jib-boom entered the window and before any ap-
preciable damage was done to either vessel, and then started again,
dragging the B.'s stern round against the end of the rack and driving
her stern against a neighboring pier, thus causing the damage to
both vessels; and the H. claimed that after she had entered her slip
about three-quarters of her length, the stern line of the B. was care-
lessly let go, and her jib filling the B. swung round to the northward
and thereby forced herself against the H., causing the damage; and
that these movements of the B. were made without any warning to
the H., and too late to enable her to prevent the collision:

*Held,* on the evidence, that the pilot of the H., acting as lookout,
might have observed the B.'s movements—the hoisting of the jib and
then the foresail indicating an intention to come out and perhaps to
cross her path—in time to have avoided the collision; and was wholly
in fault in not thus obeying the rules of navigation requiring a good
lookout to be kept, and that vessels under steam shall keep out of
the way of sailing vessels, and that this fault of the B. alone caused
the collision.

That the B. had a right to assume that this would be done, and was
not, therefore, in fault in hoisting sail.

But, on the evidence showing that the tide was ebb, running down
the river; that the H. was approaching the mouth of the slip from up
the river, heading obliquely towards a point some ways inside the
southerly rack, and, after striking it, her port bow was canted over
against the center pin, when her stern sagged with the tide against
the southerly rack before she stopped; that her length and that of the
southerly rack were each 217 feet, and the center pin 100 feet; and
the northerly side of the slip was at the time occupied by the other
ferry-boat:

*Held,* that the B.'s claim as to her position cannot be true; that it

was impossible for the starboard quarter of the H. to have projected southerly of the south side of the ferry rack far enough to engage the jib-boom of the schooner, if the latter was in the position she claimed to be in, and that the B.'s jib-boom must have extended crosswise in a north-westerly direction beyond the inner line of the ferry rack.

*Held,* that the whole damage was done before the headway of the H. was stopped, and the claim that the pilot left his post before his boat brought up against the center pin, and conversed with the B.'s captain, and threatened the damage complained of, is, under the circumstances, highly improbable, and against the weight of evidence.

That the B., having thus misstated the main facts of the collision, is entitled to recover upon amending her libel, but is not entitled to costs, except disbursements.

*Henry T. Wing,* for the Henry D. Brewster.

*W. J. A. Fuller,* for the Hackensack.

CHOATE, D. J. These are cross-libels to recover damages caused to both vessels by a collision between the Hackensack, a steam ferry-boat running between Hoboken and the foot of Barclay street, New York, and the schooner Henry D. Brewster. The collision happened in the day-time, on the thirtieth day of July, 1879, while the ferry-boat was entering her slip at the foot of Barclay street. The schooner is a small vessel, of about 66 feet length from stem to stern. She had brought from Virginia a cargo of watermelons, which she had discharged at the pier next south of the ferry slip, and had hauled up to the south side of the southerly ferry rack, and there made fast, in the forenoon, some distance inside the end of the ferry rack. At about 1:30 o'clock she hauled down to the end of the ferry rack, and there again made fast, with the stem of the schooner about even with the outer end of the ferry rack. In this position she had out a short bow-line and a long stern-line, both leading to spiles on the southerly side of the rack. She made this change preparatory to getting under way for the foot of Tenth street, North river, for which place she was bound. After getting into this position she hoisted her jib and cast off her bow-line. The effect of this was that the tide running down set her off from the rack towards the Vesey-street pier, the wind, which was southerly, being light, and the wind on her jib not being sufficient to keep her head up to the rack. They then hoisted

the foresail, the effect of which was to make her pay off the other way, towards the west and north, and she brought up with her starboard side, at about the fore rigging, pressing against the corner of the ferry rack. While two men were standing by the starboard fore rigging, pushing or breasting her off from the rack, the master ran aft to order the stern-line thrown off the spile by the men on a schooner lying astern of his vessel, but before he got aft, or the stern-line was thrown off, he was stopped by a cry from one of the men forward that the ferry-boat was running into them. Almost immediately afterwards the jib-boom of the schooner entered one of the windows of the starboard side of the ferry-boat aft of the paddle-box. The ferry-boat was then partly in her slip, her after part projecting out into the river beyond the end of the ferry rack. The first question to be determined is in what position the schooner was lying with reference to the rack when her jib-boom went into the window of the ferry-boat. It is claimed, on behalf of the schooner, and seems to be believed by those on board of her, that she was lying with her whole starboard side close up to the south side of the ferry rack. If this was her position, there could be no excuse for the ferry-boat running into her; but if this were her position, then the end of her jib-boom must have been at least 11 feet, or half the width of the schooner, southerly of the line of the southerly side of the ferry rack, and about 17 feet southerly of the line of its inner or northerly side. I am satisfied from the evidence that this cannot have been her position, but that when her foresail and jib had begun to draw sufficiently to bring her starboard fore rigging up again to the corner of the rack, her stern was still off from the rack sufficiently to make the end of her jib-boom extend crosswise in a north-westerly direction beyond the line of the inner or northerly side of the rack.

This is the position in which those on the ferry-boat testify that they saw her, with the two men breasting her off, at the corner of the rack, as the ferry-boat entered the slip. The evidence is satisfactory from both sides that, in entering the slip, the ferry-boat, to avoid the effect of the ebb-tide,

approached the mouth of the slip from up the river, heading in obliquely towards a point some ways inside of the southerly rack, and after striking the southerly rack her head was canted over towards the center pin, a short rack between the two ferry bridges, and her stern was by the same movement, aided by the ebb-tide, sagged down against the southerly rack. It was while so sagging down and coming with her starboard side against the rack that the jib-boom entered the cabin window. The length of the ferry-boat and also that of the rack is 217 feet. The length of the center pin is about 100 feet. There was another ferry-boat in the slip on the north side of the center pin. It is quite certain, from the evidence, aided by the models and drawings of the ferry slip and the boats, that the Hackensack could not, with the ebb-tide running, and with the other boat in her slip, have made her slip at all, if her stern projected southerly of the southerly line, so far as to engage the jib-boom of the schooner lying straight with the ferry rack, or indeed lying in any way, without projecting to the north of the line of the southerly side of the ferry rack. The ferry-boat made her slip, being thrown over by striking the southerly rack, so that her port bow brought up against the southerly side of the center pin before her way was entirely stopped. It was impossible for her to do this if her starboard quarter projected south of the ferry rack, or covered any part of the mouth of the Vesey-street slip, as some of the witnesses on the part of the schooner testify that it did. They are clearly mistaken, being misled by imperfect observation. It may have seemed so to them from their points of view. The fact that the schooner still had her stern-line out, and that it had not been thrown off of the spile to which it was made fast, does not, as claimed on her behalf, show that she was not heading across the corner of the ferry rack. It must, of course, have been slack enough to allow her stern to stand off sufficiently for this purpose. This point being determined, the next question is whether the ferry-boat stopped after the jib-boom entered the window, and whether she was then started ahead again by her pilot while the jib was so sticking into the

cabin. It is claimed on behalf of the schooner that when the jib-boom entered the window, and before any appreciable damage was done to either vessel, the ferry-boat stopped, the pilot came out on the upper deck and held a conversation with the master of the schooner, in which he threatened to go ahead, and tear him out or clear him out; that then he went into the pilot-house, started his engine and boat, and dragged the schooner round with her stern against the corner of the rack, driving her stern back and across against the Vesey-street pier, doing great additional damage to the schooner, and tearing out four windows in the cabin of the ferry-boat, with the joiner work between them, before he stopped the boat again. But I think the weight of the evidence is in favor of the Hackensack on this point, and that while the striking of the bow of the ferry-boat against the south rack checked her speed, and perhaps gave the appearance of her forward movement being stopped to the bystanders, as they saw her stern sag over towards the rack, yet that her way was not fully stopped till her port bow brought up against the center-pin, and that during this movement the damage was principally done; that it was not until then that the pilot came out of the pilot-house and held a conversation with the captain of the schooner. I think it highly improbable that the pilot should have left his post under the circumstances described, with the stern of his boat in the ebb-tide, and the bow in the slip beyond the center pin, with another ferry-boat in the northerly slip, and his own boat liable to drift in a way to injure the other boat, or to make it impossible for him to reach his own slip without backing out; and the weight of the testimony is against it. The Hackensack was undoubtedly moving forward very slowly at this time, but the effect of any movement was to swing the head of the schooner round closer to the corner of the rack, and to break away the joiner work between the cabin windows as it was broken, and to breab the jib-boom, bowsprit, and head-gear of the schooner. When the pilot came out he suggested hauling the schooner back. This was done. The vessels being clear of each other the ferry-boat went on up to her bridge.

The case made by the libel of the schooner that the ferry-boat thrust herself against the schooner lying along-side the ferry rack is clearly not made out. The case made by the libel of the ferry-boat is that after the ferry-boat had entered her slip, about three-quarters of her length, and was within about 30 feet from her bridge, those in charge of the schooner carelessly let go her stern-line, and the wind filled her jib, which swung her head to the northward, and thereby forced the jib-boom and bowsprit through the window of the ferry-boat; that the ferry-boat had no warning or indication that those in charge of the schooner intended to let go their line or make any movement that would render a collision possible. The point made here is that the schooner made no movement indicating her intention to come out of the slip and cross the path of the ferry-boat till it was too late for the ferry-boat, by movements on her part, to avoid the collision. I am satisfied, upon the testimony, that after the pilot of the ferry-boat noticed how the schooner was coming out of the slip he could not have managed his boat otherwise than he did, so as to avoid the collision or lessen its effects; but he admits that he did not see the schooner till the bow of his boat was within about 50 feet from the upper rack, and not till after he had rung his bell to stop the boat in order to prevent her coming too rapidly into the slip. Then what he saw was that the schooner was pointing obliquely across the line of the southerly rack, and the two men were breasting her off at the end of the rack. He was doing duty as pilot and keeping a lookout too. He had a deck hand with him in the pilot-house, but he was his own lookout. When the pilot saw this he thought there would be a collision. There is no evidence of anything having previously obstructed the view or prevented his seeing the schooner hoist first her jib and then her foresail. I think if he had kept a good lookout he would have seen this, and would have had a warning or indication of her intention to come out of the slip, which would have made it his duty to have stopped sooner till he ascertained which way she was going. She had a right to come out round the corner of the rack and go up the river, and when her fore-

sail went up, and she begun to pay off to the north, he should have stopped or slowed, and watched her movements. This was not long before he saw her, but still it was, upon the evidence, a sufficiently long time before to have enabled him, in the position he then was in, to have stopped seasonably to have avoided the collision. The schooner had no right to make a movement round, the pier, without warning, which should thrust her jib-boom into a ferry-boat already in a position where she could not by her own movements avoid the collision. This is the case the ferry-boat attempts to make, but I think she has failed to make it out. From the time the schooner hoisted her foresail her paying off to the northward was inevitable, and at that time the ferry-boat was so far off that the movement did not involve danger of collision if the ferry-boat had observed the rules of navigation to keep a good lookout and to keep out of the way of sailing vessels. This those on the schooner had a right to assume would be done by the ferry-boat. They were not, therefore, in fault in hoisting the sail. The ferry-boat has pleaded, also, that the schooner had no right to make fast to the ferry rack; but this point was very properly abandoned upon the trial. The damages claimed are small, and the parties have agreed that the court may permit such amendments to the pleadings as may be necessary to conform them to the state of facts found by the court, making such provision as shall be deemed just as to costs.

Upon the foregoing considerations I think the ferry-boat was alone at fault; that she did not keep a good lookout; that she failed to observe a movement of the schooner which indicated that she was coming out of the slip and might cross the path of the ferry-boat, until it was too late to prevent a collision. The libel on behalf of the schooner may be amended accordingly, but as the libellants have misstated the main facts of the collision in their libel, no costs to this time will be allowed except disbursements.

Decree for libellants Smith and others for their damages, without costs to this time, except disbursements, with reference to compute damages. Libel of Hoboken, etc., Land & Improvement Company dismissed with costs.